**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF MASSACHUSETTS**

**EASTERN DIVISION**

| | |
|---|---|
| **In re** | |
| **MAXYNE ALEXANDER,** | **Chapter 7** |
| | **Case No. 07-16808** |
| Debtor | |
| **DANVERS SAVINGS BANK,** | |
| Plaintiff | |
| **v.** | |
| | **Adversary Proceeding** |
| **MAXYNE ALEXANDER,** | **No. 07-01451** |
| Defendant | |

**MEMORANDUM OF DECISION**

**I.      Overview**

Danvers Savings Bank ("Danvers") filed this adversary proceeding in the bankruptcy

case of Maxyne Alexander ("Maxyne" or "the Defendant") to determine the dischargeability of

Maxyne's judgment debt to Danvers arising from losses sustained by Danvers' predecessor in

interest in June of 2000.  The losses arose from a check kiting scheme carried out by

Maxyne's adult daughter Karen Alexander, allegedly in concert with Maxyne herself, on a bank

account in the name of Aquamarine Construction Supply, Inc., a corporation owned by Karen.

Danvers contends that its judgment debt should be excepted from discharge on each of four

separate statutory grounds, 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).[1]  After a

two-day trial, the court now makes the following findings of fact and rulings of law and holds

that Maxine's debt to Danvers is not excepted from discharge.

---

[1]   In addition to seeking a determination of nondischargeability, the complaint also stated a further
claim against Maxyne for liability.  On February 8, 2005, the court issued an order abstaining from
adjudicating the liability count, having determined that it is not a core proceeding.  Only
dischargeability counts remain.

## II.      Facts

The facts relevant to this proceeding involve three principal players:  Revere Federal

Savings Bank ("Revere Federal"), a local bank with branches in Chelsea and Revere,

Massachusetts, that subsequent to all relevant events merged with Danvers; Karen Alexander,

Maxyne's adult daughter, whose history of credit problems stretches back to the 1980s; and

Maxyne, Karen's mother.  On June 22, 2000, Revere Federal discovered its exposure to

losses on a checking account in the name of Aquamarine Construction Supply, Inc.

("Aquamarine").  This exposure resulted from Revere Federal's issuance of bank checks and

money orders against an artificial account balance created by a series of nonsufficient funds

checks ("NSF checks") deposited by Karen into the Aquamarine checking account at Revere

Federal.

Aquamarine was a Massachusetts corporation of which Karen was at all relevant times

the sole owner, officer, and director.  Maxyne, a highly educated woman with significant

business experience, testified that she worked as a marketing consultant for Aquamarine,

though the time she could devote to her daughter's business was limited by the full-time job

she held as a horticulturalist at The Home Depot.  Additionally, Karen had bestowed on her

mother a power of attorney that authorized Maxyne to run the affairs of Aquamarine.  This

power included authority to sign checks on Aquamarine's behalf.

The relationship between Aquamarine and Revere Federal grew out of a telephone call

from Tom Medaglia, an accountant serving the Chelsea area, to David Boudreau, a

commercial loan officer at Revere Federal.  Medaglia, who from time to time provided Revere

Federal with leads regarding potential customers, recommended Karen as a customer with a

potentially significant business account.  Boudreau instructed Susan McLaughlin, a business

development officer for Revere Federal who worked out of the Chelsea branch, to contact

2

Karen about moving her accounts to Revere Federal.  McLaughlin placed a call to Karen, and

the two set up an appointment to meet the following day.

On or about June 13, 2000, McLaughlin traveled to Aquamarine's office in Chelsea

where the two discussed Revere Federal's products and services.  Maxyne was not present

for any portion of this meeting.  Karen told McLaughlin that she was interested in moving the

Aquamarine account because she was dissatisfied with the holds that her current bank,

Cooperative Bank ("Cooperative"), was placing on checks deposited into the account.[2]

During the meeting, Karen disclosed to McLaughlin that she had a negative record, or

"file," with the National Check Protection Service ("NCPS").  McLaughlin explained that NCPS

is a nationwide service that supports financial institutions by providing, upon the institution's

request, reports about the checking histories of potential customers, especially whether they

have a record of depositing NSF checks.  Karen explained to McLaughlin that her NCPS file

was negative because of checks deposited into her account which were subsequently

returned for nonsufficient funds.  According to McLaughlin, Revere Federal would ordinarily

refuse to open an account for a potential customer with a negative NCPS file.  McLaughlin,

however, moved forward with establishing an account for Aquamarine because she trusted

Karen as a referral from Medaglia and because Karen told McLaughlin that her mother,

Maxyne, would be the primary controller on the account.  McLaughlin told Karen that she could

not finish opening the account until her mother provided the bank with her own signature and

information.

The following day, on or about June 14, 2000, Karen arrived at Revere Federal's

Chelsea branch at the end of business hours and asked McLaughlin to open the account at

that time because she and her mother were leaving for Puerto Rico the next day.  McLaughlin

---

[2] Karen also had an interest in moving other accounts to Revere Federal and ultimately did open a personal account with the bank.  Plaintiff's case against Defendant does not rely on the personal account and its activity.

again told Karen that she could not open the account until her mother came to the branch and completed her part of the account-opening process.  At Karen's request, McLaughlin placed a call to Maxyne at The Home Depot.  This telephone call constituted Revere Federal's first contact with Maxyne.  McLaughlin explained to Maxyne that she could not honor Karen's request to open the Aquamarine account without Maxyne's information and signature.  After speaking with Maxyne, however, McLaughlin opened the account, expecting that Maxyne would eventually come to the branch to offer her identification and signature.

McLaughlin testified, however, that before she took Maxyne's information and opened the account, Maxyne gave her instructions regarding Karen's involvement with the account. Maxyne's instructions, as McLaughlin's recounted them, were as follows: "that Karen was to under no circumstances be able to write checks, that [Maxyne] would be handling the account, that Karen could make deposits; however, she would have limited access to the writing of any checks and signing on any of the checks."[3]

McLaughlin also testified that Maxyne explained to her that "Karen was not very good at handling her banking accounts, and that [Maxyne] did not want her to have access to the checks."  At trial, Maxyne testified that even though she maintained joint bank accounts with her daughter, she knew that her daughter had problems relating to her credit and passing nonsufficient funds checks.

Following the telephone call to Maxyne, Karen presented McLaughlin with a $10,000 check for deposit, and McLaughlin deposited it into the newly-created account.  This check, which was signed by Maxyne but otherwise written in someone else's handwriting, was ultimately returned for nonsufficient funds.

---

[3] McLaughlin did not expand upon what Maxyne meant by "limited access."

4

On or around June 19, 2000,[4] Karen and her mother visited the Chelsea branch and

met with Kathleen Pendleton, a vice president of Revere Federal and manager of the Chelsea

branch who was handling the Aquamarine account while McLaughlin was away for a few days

on vacation.  Prior to McLaughlin's departure, McLaughlin asked Pendleton to complete the

paperwork on the Aquamarine account, including by obtaining Maxyne's identification and

signature.  McLaughlin left Pendleton the account file, which included account signature cards

and McLaughlin's notation that Karen was not to sign checks on the account without her

mother's written or verbal consent.

At trial, Pendleton offered testimony regarding her June 19 meeting with Karen and

Maxyne.  Pendleton testified that at the meeting, she obtained Maxyne's signature on the

account signature card and a copy of Maxyne's driver's license.  Additionally, Pendleton

testified that while both Karen and Maxyne were at her desk, Karen or Maxyne—she could not

remember which it was—presented her with three checks for deposit.  These three checks

totaled $260,000 and were drawn on an account at Cooperative in the name of

Aquamarine/Daisy Supply LLC ("ADS").  Maxyne testified that she wrote and signed each of

the three checks.  Pendleton deposited the checks, adding $260,000 to the $10,000 that

ostensibly was already in the Aquamarine account.  In contravention of Revere Federal's

usual policy for new accounts, Pendleton did not place a hold on the deposited funds but

instead made the $260,000 immediately available for withdrawal from the account.  At Karen's

request, Pendleton then issued from the account a bank check in the amount of $81,081,

made payable to Frank I. Rounds Company, a creditor of Aquamarine.[5]   The three ADS

checks totaling $260,000 were ultimately returned for nonsufficient funds.

---

[4] Maxyne disputes the precise date of this meeting, but the small discrepancy between the parties
as to this date is not material to the outcome in this proceeding.
[5]  In its post-trial brief, Danvers concedes that Karen requested this bank check.

Before Pendleton issued the $81,081 check that Karen requested, Pendleton was shown a printout from Cooperative that indicated that the balance of the ADS account at Cooperative (the account on which the three deposited checks had been drawn) was approximately $466,000 on that morning that the three checks were presented for deposit at Revere Federal (the "Cooperative Statement"). The Cooperative Statement bore a date and time stamp indicating that it was only a few hours old at the time of its presentation to Pendleton. The Cooperative Statement was false[6]; other evidence in the record demonstrates that there was no more than $730.14 in the account on that morning. No evidence has been presented as to how the statement was obtained or whether it was fabricated or tampered with before presentation to Pendleton. Pendleton testified that the Cooperative Statement was presented to her by Maxyne; Maxyne maintains that Karen presented it. The evidence is inconclusive on this point. Pendleton testified credibly that she made the $260,000 in funds immediately available for withdrawal for two reasons: first, she had a "comfort level" with the account because it had been referred to the bank by Medaglia; and second, the Cooperative Statement had indicated there were sufficient funds in the ADS account to cover the deposited checks.

ADS was a joint venture between Aquamarine, whose principal was Karen, and Daisy Electric, Inc., whose principal was a Denise Herrera-Favaloro. Maxyne, along with Herrera-Favaloro, had authority to sign checks on the ADS account at Cooperative; Maxyne had this authority because Karen was unable, due to her negative NCPS file. At trial, Maxyne testified that she did not stand to profit from the joint venture, but the evidence suggests that she was heavily involved in its affairs, as evidenced not only by her check-writing authority on its account and by the fact that Maxyne signed ADS's 2000 annual report with the Commonwealth of Massachusetts.

---

[6] The document was not adduced at trial.

6

On or about June 20, 2000, the following events occurred.  Karen deposited three checks totaling $857,000 into the Aquamarine account at Revere Federal and subsequently made withdrawals from the same account totaling $546,000.  The three deposited checks, made and signed by Karen, were drawn on a joint account in the names of Karen and Maxyne at the First Bank of Puerto Rico ("FBPR").  The FBPR account was opened on May 5, 2000 for the purpose, Maxyne testified, of personal convenience during a prolonged business trip in Puerto Rico.  The three FBPR checks were later returned for nonsufficient funds.

Pendleton handled the June 20 transactions on the Aquamarine account while McLaughlin remained away on vacation.  Maxyne was not present with Karen at the bank when these transactions occurred.  As Pendleton testified, Karen requested that the bank issue checks from the balance created by these funds.  Pendleton testified that she did not contact Maxyne before permitting Karen to obtain these checks and money orders.  Pendleton accommodated Karen and issued a total of five bank checks and six money orders against the balance in the Aquamarine account.

The first two bank checks totaled $45,000 and were made payable to unidentified third parties.  The third bank check, for $5,000, was made payable to Karen herself; Karen cashed this check later the same day.  The fourth and fifth bank checks totaled $490,000 and were made payable to AquaChem, a creditor of Aquamarine.  The six money orders were each in the amount of $1,000.  One was later made payable to Jaguar Credit and signed by Maxyne, who owned a Jaguar automobile.

On June 22, 2000, Revere Federal learned that the checks drawn on the ADS account at Cooperative and deposited into the Aquamarine account would be returned for nonsufficient funds.  Shortly thereafter, Revere Federal called the First Bank of Puerto Rico and discovered that Karen's and Maxyne's joint account there had insufficient funds to cover the checks Karen had written and deposited into the Aquamarine account.  Revere Federal then issued stop

payments on all of the bank checks and three of the money orders it had issued against the

Aquamarine account.

McLaughlin testified that following the discovery of the insufficiencies in the

Aquamarine account, Karen visited the branch and indicated that the insufficiencies were a

mistake.  According to Danvers, Karen deposited at least $49,600 into the Aquamarine

account over the next few days to offset some of the losses.  McLaughlin testified that in a call

to Maxyne regarding the insufficiencies, Maxyne simply denied involvement with the matter.

Revere Federal was ultimately unable to avoid losses on the Aquamarine account from

the above transactions.  Its losses totaled approximately $250,000, after adjustment for funds

deposited into the account after Revere Federal discovered the insufficiencies, including

Karen's deposits.[7]  The bank checks to Frank I. Rounds Company, which were issued on June

19 immediately following the deposit of $260,000 in nonsufficient funds checks made and

signed by Maxyne, resulted in a $66,545 loss.  The $546,000 in bank checks and money

orders Karen withdrew from the account on June 20 immediately after depositing $857,000 in

nonsufficient funds checks resulted in a $269,455 loss.

Litigation began in August 2000 in the Suffolk Superior Court, where Danvers filed a

complaint against both Karen and Maxyne alleging, *inter alia,* fraud, deceit, and a common

scheme to defraud Revere Federal.  Danvers' case against Karen resulted in entry of default

judgment in favor of Danvers in May 2001.  In Karen's subsequent bankruptcy case, the

bankruptcy court, pursuant to an agreement between Karen and Danvers, ordered that

Karen's debt arising from the state court judgment was nondischargeable.

Danvers and Maxyne entered into a settlement agreement in September 2004 that

required Maxyne to pay to Danvers a lump sum of $140,000 on or before October 29,  2004,

---

[7] The vast majority of Revere Federal's losses arose from the transactions described herein.
Revere Federal also sustained small losses on other transactions, but Plaintiff's case against
Defendant does not rely on these other transactions to any significant degree.

8

failing which judgment would enter against her in the amount of $375,000.  Maxyne never paid

$140,000 to Danvers, and judgment consequently entered against her in the amount of

$375,000.  On October 25, 2007, Maxyne filed a voluntary petition for relief under Chapter 7 of

the Bankruptcy Code in this court, thereby commencing the present bankruptcy case.

The gravamen of each of Danvers' counts for nondischargeability is Maxine's alleged

conduct on June 19, 2000:  specifically, her misrepresentation as to the amount available in

the ADS account at Cooperative, a misrepresentation that Danvers says Maxine made by

presenting to Pendleton the false Cooperative Statement; and her alleged simultaneous

presentation for deposit of three NSF checks totaling $260,000—each of which was written

and signed by Maxyne herself.  On the basis of these acts, Danvers contends, Revere Federal

was induced to issue a bank check in the amount of $81,081 from the artificial balance created

thereby.  Danvers' fundamental argument is that when Maxyne presented the Cooperative

Statement and NSF checks to Pendleton, she did so with intent to deceive, defraud, convert,

and injure.  The court must therefore determine whether Danvers has sustained its burden of

proving that Maxyne acted, either on her own or in concert with Karen, with intent to deceive

Danvers by the Cooperative Statement and by the presentation for deposit of checks she

herself had signed, and thereby to cause Danvers, in reliance on the NSF checks, to issue an

$81,081 check to Karen.

The evidence of such intent and complicity against Maxyne, though circumstantial, is

not insubstantial.  The financial affairs of Karen and Maxyne were highly intertwined.  Maxyne

had power of attorney over Karen's businesses, Aquamarine and ADS, and was involved in

the affairs of those businesses.  Karen relied on and needed Maxyne to write checks on the

accounts of her business ventures.  Maxyne was also well aware of Karen's history of passing

NSF checks and other credit problems and therefore of the importance to Karen's banks of her

(Maxyne's) performing her role conscientiously.  Moreover, Maxyne undertook to give comfort

9

to the banks with which Karen dealt—both Cooperative and Revere Federal—by acting in lieu of Karen as the party exercising control over the checking accounts of those businesses.  The clear implication and message created by this undertaking—a message clearly telegraphed by both Karen and Maxyne to Revere Federal, if not also to Cooperative—was that Maxyne would do what Karen could not be trusted to do:  keep careful track of the amounts in the checking accounts in question and issue only such checks against those accounts as there were funds in the accounts to cover.  Notwithstanding this undertaking and her knowledge of her responsibility as keeper of these accounts, Maxyne testified, she routinely signed checks from these accounts in blank for Karen to use.  She testified that these checks were limited in number and that she did this so that Karen could write checks in emergencies, but she offered no explanation as to how she could limit Karen's use of these blank checks to emergencies, much less how she could square this practice with her obligations to the banks.  The court finds that Maxyne held herself out to the banks, including Revere Federal, as one who would do responsibly what the banks were unwilling to entrust to Karen, but she routinely abdicated this responsibility by making blank checks available to Karen to issue when and as Karen, in her sole discretion, saw fit.

In addition, Maxyne was directly involved in the events of June 19, 2000.  The three Cooperative checks that were deposited on that day at Revere Federal were all checks that she herself had written and signed.  She wrote and signed them that very day, for the purpose (at least ostensibly) of transferring funds to Revere Federal.  Whether she herself or Karen actually presented them, she was present when the checks were presented for deposit, when the Cooperative Statement was presented to Pendleton, and when Karen asked Pendleton to issue an $81,081 bank check against the balance in the Aquamarine account.  By this time, she had already indicated to Revere Federal that she would do for the Aquamarine account what Karen could not be counted on to do.  Therefore, by her presence with Karen that day

10

when these events transpired, Maxyne served as assurance to Pendleton and Revere Federal

that it was safe for Revere Federal to issue an $81,000 check against the three checks

deposited that day.  Despite the fact that the Cooperative Statement proved false and that the

three checks she had written were subsequently returned for nonsufficient funds, Maxyne

offered no explanation for the falsity of the statement, for the insufficiency of funds to cover the

checks, or for why, in view of the insufficiency of funds, she wrote the checks in question.

The evidence further shows that, to a limited extent, Maxyne benefitted from the funds

obtained by Karen on June 20 on the strength of other checks later returned for insufficient

funds.  Specifically, Karen gave to Maxyne one of the $1000 money orders she obtained that

day, and Maxyne used that money order to make a payment on the Jaguar she drove.

This is the extent of the case against Maxyne.  Nothing in this evidence is exculpatory

or inconsistent with intent to deceive and defraud by conspiring with Karen in a check kiting

scheme.  Still, Danvers must prove and the court must find not just that it is possible or

plausible that Maxyne had the necessary intent, but, by a preponderance of the evidence, that

she did have that intent.  The court finds that the evidence falls short on the specific intent

requirement in a number of respects.

First, from her earliest contact with Revere Federal, Maxyne put Revere Federal on

notice of her daughter's history of checking and credit problems.  She went so far as to tell

officials at Revere Federal that Karen should have no check-writing authority.  Maxyne cannot

be said to have encouraged Revere Federal to honor requests by Karen for disbursal of funds

from the account.  She affirmatively gave them cause for skepticism and extraordinary care in

the handling of this account.  In addition, her warning should also have caused Revere

Federal to use extra caution when issuing funds against balances created by deposit of

checks from other accounts over which Karen had any control, including the Cooperative

account (as to which Karen could at least deposit funds, or NSF checks) and the First Bank of

11

Puerto Rico account she shared with Maxyne.  The NSF checks that gave rise to Revere

Federal's losses all were issued on these accounts.  In short, at the time of the events in

question, Maxyne had recently put Revere Federal on notice of precisely the conduct that

Danvers is alleging she intended to help Karen perpetrate.  This warning is inconsistent with

intent to defraud through the alleged check-kiting scheme.

Second, Karen clearly was heavily involved in all the activity that led to Revere

Federal's losses.  Karen deposited the NSF checks on June 14 and June 20 and was at least

present when the June 19 NSF checks were presented for deposit.  And Karen, not Maxyne,

requested every one of the bank checks and money orders that caused the bank's losses.

Maxyne's involvement was limited to the June 19 events, and, as to those, she could as

plausibly have been a mere bystander without knowledge of what Karen was doing as a

knowing conspirator in Karen's scheme.  Where Karen, who had a well-established history of

passing NSF check,  was heavily involved in every part of the events that caused Revere

Federal's losses, it simply is unnecessary to find that Maxyne had any knowing and fraudulent

role in the scheme.  The events can as easily and more plausibly be explained as wholly

Karen's doing.

Third, direct evidence against Maxyne as to the June 19 events is in some respects

either wholly lacking or inconclusive.  The evidence is inconclusive as to who, as between

Karen and Maxyne, presented the Cooperative Statement and the three ADS checks on June

19.  Where the burden of proof is on Danvers, the court cannot find that Maxyne presented

these herself.  More importantly, Danvers has adduced no evidence that Maxyne knew that

the Cooperative Statement was false or that the checks being presented for deposit were not

covered by sufficient funds.  A statement showing activity on the ADS account at Cooperative

for the month in question shows that the account had had sufficient funds to cover the June 19

checks just days before.  It is quite possible that Maxyne believed—perhaps negligently but

12

nonetheless honestly—that the account did have sufficient funds to cover the checks.

Danvers has also failed to establish that Maxyne knew, when she wrote the checks in question

and they were presented for deposit, that Karen intended to draw against them before they

cleared—or, for that matter, that Revere Federal would let her do so.  On new accounts,

Revere Federal's usual policy—from which it departed here in order to win Karen's business—

was not to permit withdrawals during the first thirty days of a new account.

For all these reasons, the court concludes that the evidence against Maxine on the

issues of intent and common scheme to deceive and defraud does not amount to a

preponderance.  The issue is a close one, and it is quite possible that Danvers' allegations are

correct.  Still, the court's only task is to determine whether the evidence preponderates in

support of the allegations, not to divine what actually occurred, and the court is satisfied that it

does not.

## III.    Discussion

In furtherance of the Bankruptcy Code's "fresh start" policy, exceptions to discharge

are narrowly construed.  *Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir. 1997).  As a

creditor seeking a determination of nondischargeability, Danvers bears the burden of proving

that its judgment against Maxyne comes squarely within an exception enumerated in 11

U.S.C. § 523(a) and must prove its case by a preponderance of the evidence.  *Grogan v.

Garner,* 498 U.S. 279, 291 (1995); *Palmacci,* 121 F.3d at 787.  Accordingly, with respect to

each of Danvers' counts under the various subsections of § 523(a), if Danvers fails to

establish any one necessary element by a preponderance of the evidence, the court should,

without more, reject Danvers' claim under that subsection.  *Palmacci,* 121 F.3d at 787-788.

The debt at issue here arose in the most immediate sense from a settlement

agreement pursuant to which judgment entered by agreement.  Danvers alleges no irregularity

in the negotiation and execution of that settlement agreement, but the fact and innocence of

the settlement do not wash the resulting judgment debt from the taint, if any, of the alleged

wrongful acts that formed the basis of Danvers' state court complaint.  The agreed judgment

does not bar Danvers from showing that its debt is the result of the underlying wrongful acts.

The court may and must inquire as to Maxine's underlying conduct to determine the

dischargeability of the judgment debt under § 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).[8]

The court now examines in turn each of Danvers' counts for nondischargeability under

11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).[9]


**A.      11 U.S.C. § 523(a)(2)(A)**

Danvers first asserts that Maxine's debt to Danvers is nondischargeable under 11

U.S.C. § 523(a)(2)(A).  Subsection 523(a)(2)(A) excepts from discharge a debt for "money,

property, services, or an extension, renewal, or refinancing of credit, to the extent obtained,

by—false pretenses, a false representation, or actual fraud, other than a statement respecting

the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).  A debt is

nondischargeable under this subsection when it is "the result of the debtor's false statement,

made with knowledge of its falsity, with the intent to deceive the creditor, and where the

creditor justifiably relies on the representation to its detriment."  *Farley v. Romano (In re

Romano)*, 353 B.R. 738, 767 (Bankr. D. Mass. 2006) (citing *Palmacci*, 121 F.3d at 786-787).

---

[8]  *Archer v. Warner,* 538 U.S. 314, 321-322 (2003) (a debt for money promised in a settlement
agreement that settled a claim for money obtained by fraud can be a debt arising from the
underlying fraud for purposes of 11 U.S.C. § 523(a(2)(A)); *see Collier on Bankruptcy,* ¶ 523.06A
(15th ed. Rev. 2009).

[9]  Plaintiff's Complaint also included a count for nondischargeability under 11 U.S.C. § 523(a)(11);
however, Danvers did not argue this count in its post-trial brief and therefore the count is deemed
waived.

One of the false statements on which this count is predicated is Maxine's presentation to Pendleton of the printout from the ADS account at Cooperative, which showed $466,000 in the ADS account as of the morning of June 19, 2000.[10]  As a preliminary matter, the court notes that although the Cooperative Statement is a statement in writing, it does not concern "the debtor's or an insider's financial condition" within the meaning of 11 U.S.C. § 523(a)(2)(B), and therefore (i) cannot be cause for exception from discharge under (a)(2)(B) and (ii) is appropriately considered under § 523(a)(2)(A).[11]  The Cooperative Statement is properly considered under § 523(a)(2)(A), not (a)(2)(B), because it is not a statement of "financial condition."  11 U.S.C. § 523(a)(2)(B)(ii).  That term has been narrowly construed to require "[an] accounting of an entity's overall financial health and not a mere statement as to a single asset or liability."[12]  The Cooperative Statement reflects the value of only one asset belonging to ADS; it cannot be said to reflect ADS's—much less Maxine's—overall financial health.[13]  Consequently paragraph (a)(2)(B) does not apply to this alleged misrepresentation.

The specific intent element that Danvers must establish under § 523(a)(2)(A) is an intent "to deceive, manipulate, or defraud."  *Palmacci,* 121 F.3d at 787.  To prove fraudulent intent, Danvers must show that Maxyne acted with an actual intent to mislead or was reckless in disregarding the truth of a representation.  *Aoki v. Atto Corp. (In re Aoki),* 323 B.R. 803, 811 (B.A.P. 1st Cir. 2005) (quoting *Palmacci,* 121 F.3d at 788-789).  Fraudulent intent requires

---

[10]  The Cooperative Statement was not adduced at trial.

[11]  The courts have construed paragraphs (a)(2)(A) and (a)(2)(B) as mutually exclusive, such that where the false representation that forms the basis of a count under § 523(a)(2) is a "statement respecting the debtor's or an insider's financial condition," its dischargeability under § 523(a)(2) must be determined under paragraph (a)(2)(B).

[12]  *Bal-Ross Grocers, Inc. v. Sansoucy (In re Sansoucy)*, 136 B.R. 20, 23 (Bankr. D. N.H. 1992); *Douglas v. Kosinski (In re Kosinski)*, — B.R. —, 2010 WL 706059, at 6 (1st Cir. BAP 2010) (a statement of financial condition "must, in some way, describe the financial condition of the debtor"); *Charlie Kelton's Pontiac, Cadillac, Oldsmobile & Isuzu Truck, Inc. v. Roberts (In re Roberts),* 82 B.R. 179, 184 (Bankr. D. Mass. 1987) (noting that a statement pertaining only to one bank account does not describe a debtor's "financial condition").

[13]  Having so ruled, the court need not address the further question that would arise under § 523(a)(2)(B):  whether ADS is an insider as to Maxine.

15

more than mere negligence. *Palmacci,* 121 F.3d at 788. "An honest belief, however unreasonable, that the representation is true and that the speaker has information to justify it is an insufficient basis for deceit." *Id.* The court, however, may consider the unreasonableness of a debtor's asserted errant belief as "evidentiary ballast" for fraudulent intent. *Id. at 789.* Availability of direct evidence to prove a debtor's intent to deceive a creditor is unlikely to be obtained. The court, therefore, may infer fraudulent intent from the totality of the circumstances. *Id. at 789.*

The false representations on which Danvers relies for its count under § 523(a)(2)(A) are Maxine's presentation of the Cooperative Statement to Pendleton at Revere Federal on June 19 and her presentation of the three nonsufficient funds checks for deposit at the same time. For reasons set forth above, the court has found that, with respect to both the Cooperative Statement and the presentation of the three checks, Danvers has not sustained its burden of proof as to knowledge of falsity and intent to deceive or defraud. In addition, nonsufficient funds checks, without more, cannot support a claim under § 523(a)(2)(A). A check does not constitute a representation that there are sufficient funds in the account to cover the check. *New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez),* 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002); *see Williams v. United States,* 458 U.S. 279 (1982). In any event, even as to an NSF check presented under the false pretense that there are funds in the account to cover the check, a creditor must prove knowledge of falsity—i.e., knowledge of insufficiency of funds to cover the check—and intent to defraud, and those elements have not been established here. Accordingly, Danvers' count under 523(a)(2)(A) must be dismissed.

**B.      11 U.S.C. § 523(a)(2)(B)**

Danvers also argues that Maxyne's debt should be excepted from discharge under §

523(a)(2)(B).  As noted above, § 523(a)(2)(B) deals with deception carried out by a statement

in writing "respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(B).

It explicitly requires that the debtor cause this statement "to be made or published with the

intent to deceive."  *Id.*  The statement in writing that forms the basis of this count is the

Cooperative Statement, which, Danvers alleges, Maxyne presented to Pendleton.

This count fails for several reasons.  First, as explained above, the Cooperative

Statement is not a "statement . . . of financial condition" within the meaning of subsection

(a)(2)(B).  Second, to prevail on this count, Danvers must show that the writing in question

was in some sense the debtor's.  Here there is no evidence that Maxyne fabricated or

otherwise created the Statement; and the evidence is inconclusive as to whether Maxyne (as

opposed to Karen) actually presented the document to Pendleton or had any responsibility for

or complicity in Karen's presenting it.  Third, as the court concluded above, the evidence is

inconclusive as to whether Maxyne knew the document to be false and, if she was somehow

responsible for its presentation by Karen, that she presented it with intent to deceive.  For

these reasons, Danvers is entitled to no relief under § 523(a)(2)(B).

**C.      11 U.S.C. § 523(a)(4)**

In its count under § 523(a)(4), Danvers contends that Maxyne's judgment debt must be

excepted from discharge as one for either embezzlement or larceny.   Subsection 523(a)(4)

excepts from discharge debts for money obtained by, among other things, "embezzlement or

larceny."  11 U.S.C. § 523(a)(4).  Danvers contends that Maxyne committed both

embezzlement and larceny against Revere Federal when, by  presenting the Cooperative

17

Statement, she caused Revere Federal to issue bank checks and money orders on an artificial

balance created by the deposit of $260,000 in non-sufficient funds checks.

Embezzlement and larceny, within the meaning of § 523(a)(4), require, respectively,

intent to defraud and intent to convert. *Sherman v. Potapov,* 403 B.R. 151, 157 (D. Mass.

2009) (embezzlement requires circumstances indicating fraud); *Hancock v. Caliri (In re Caliri),*

335 B.R. 2, 12 (Bankr. D. Mass. 2005) (for purposes of § 523(a)(4), larceny requires intent to

convert). For reasons articulated above, the court finds that Danvers has not sustained its

burden of proof as to intent to defraud and to convert. Accordingly, Danvers is entitled to no

relief under § 523(a)(4).

### D.      11 U.S.C. § 523(a)(6)

Danvers lastly argues that Maxyne's judgment debt is excepted from discharge under

§ 523(a)(6), as a debt for "willful and malicious injury." 11 U.S.C. § 523(a)(6). The willfulness

element of this exception from discharge requires not only a willful act that causes injury but,

in the words of the statute itself, a "willful . . . injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61-

62, 118 S.Ct. 974, 977 (1998) ("willful" in (a)(6) modifies the word "injury," indicating that

nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or

intentional *act* that leads to injury). Danvers argues that Maxyne's conduct in presenting the

Cooperative Statement and in making and depositing NSF checks meets this standard.

Danvers has not sustained its burden of proving that the injury in question was willful.

For reasons articulated above, the evidence of Maxyne's complicity in and intent with respect

to the events in question—the presentation of the Cooperative Statement, the depositing of

three bad checks drawn on the ADS account at Cooperative, and the issuance of an $81,000

check against the false balance created thereby—while not exculpatory, nonetheless does not

rise to a preponderance of the evidence. The court cannot find that Maxyne acted with the

18

necessary intent to obtain funds, either for herself or for Karen or Karen's business, by check

kiting.   Accordingly, Danvers is entitled to no relief under § 523(a)(6).


### V.      CONCLUSION


On the basis of the foregoing considerations, the court concludes that Maxyne's

judgment debt to Danvers is not excepted from discharge.  Judgment will enter accordingly.


Date: March 30, 2010                                    _____
                                                       Frank J. Bailey
                                                       United States Bankruptcy Judge